**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**ALVIN KIRKLAND,**
       **Petitioner,**

**v.**                                                    **Case No.  5:07cv2/RS/MD**

**JAMES R. MCDONOUGH,**
       **Respondent.**

_____

**REPORT AND RECOMMENDATION**

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 1).  Respondent has filed a motion to dismiss the petition as time barred or, alternatively, as unexhausted.  (Doc. 13).  Although given the opportunity to respond (docs. 15, 20), petitioner has not done so.  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration, it is the opinion of the undersigned that the pleadings and attachments before the court show that the petition is untimely and should be dismissed.

**BACKGROUND AND PROCEDURAL HISTORY**

On January 25, 1999 petitioner was charged by information filed in the Circuit Court of Jackson County, Florida, with Unlawful Sexual Activity with a Minor (Count I, case no. 98-583) and Sexual Battery (Count II, case no. 99-44).  (Doc. 14, ex. A).[1]  The acts were alleged to have occurred on or about July 31, 1998.  (*Id.*).  At that time,

---

[1]Hereafter, all references to exhibits will be to those provided at doc. 14 unless otherwise noted.

petitioner was serving a 5-year term of probation for having committed a Lewd or Lascivious Act in the Presence of a Child in Jackson County case no. 94-868; therefore, an amended affidavit for violation of probation was also filed.  (Ex. A; ex. D, p. 1).   The case proceeded to a jury trial.  On January 29, 1999 the jury returned verdicts of guilty as charged in the information.  (Ex. B).  Petitioner subsequently moved for a new trial based on the alleged recanted testimony of the victim Roberta Williams.  (Ex. D, p. 2).  After a hearing, petitioner's motion for new trial based on the alleged recanted testimony was denied, but the trial court did, however, set aside petitioner's conviction in Count I (case no. 98-583) based upon petitioner's previously filed motion to require the State to elect a theory of prosecution.  (*Id.*).  On April 13, 1999 petitioner was adjudicated guilty of the sexual battery charge (Count II in case no. 99-44) and the violation of probation (in case no. 94-868).  (Ex. C).  He was sentenced to 40 years imprisonment as a violent career criminal for the sexual battery conviction, and to 5 years imprisonment for the lewd and lascivious conviction.  (*Id.*).  The Florida First District Court of Appeal ("First DCA") affirmed the judgment and sentence on May 24, 2000.  *Kirkland v. State*, 774 So.2d 696 (Fla. Dist. Ct. App. 2000) (Table) (copy at ex. F).

On December 31, 2002 petitioner filed a motion to correct illegal sentence pursuant to FLA.R.CRIM.P. 3.800(a).  (Ex. H).  The trial court denied the motion without an evidentiary hearing on July 14, 2003.  (Ex. I).  The First DCA affirmed the denial order without written opinion on October 23, 2003.  *Kirkland v. State*, 858 So.2d 1056 (Fla. Dist. Ct. App. 2003) (Table) (copy at ex. K).  The mandate issued on November 18, 2003.  (Ex. L).  Petitioner filed the instant federal habeas petition on December 28, 2006.  (Doc. 1, pp. 1, 6).

## DISCUSSION

Because petitioner filed this § 2254 petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA governs the present petition.  *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).  Pursuant to 28 U.S.C. § 2244, a one-year period of limitation

applies to the filing of a federal habeas corpus petition by a person in custody pursuant to a state court judgment. The limitation period runs from the latest of:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

§ 2244(d)(1). According to the tolling provision of § 2244(d), the time during which a "properly filed" application for state postconviction or other collateral review is pending shall not be counted toward any period of limitation. 28 U.S.C. § 2244(d)(2).

In the instant case, petitioner has not asserted that a government-created impediment to his filing existed, that he bases his claims on a right newly recognized by the United States Supreme Court, or that the facts supporting his claims could not have been discovered through the exercise of due diligence before his conviction became final. Thus, the statute of limitations must be measured from the remaining trigger, which is the date on which his conviction became final. *See* 28 U.S.C. § 2244(d)(1).

The First DCA affirmed petitioner's conviction on May 24, 2000. Petitioner did not seek review of his conviction in the Florida Supreme Court or in the United States Supreme Court. Accordingly, his judgment of conviction became "final" for purposes of § 2244 on August 22, 2000, when the ninety-day period in which to seek *certiorari* from the United States Supreme Court expired.[2]  *See* 28 U.S.C. § 2244(d)(1);

---

[2]The 90-day period for filing in the United States Supreme Court a petition for a *writ of certiorari* seeking review of a decision of a state appellate court runs from the date of the state court's opinion, not the date of issuance of the mandate. See SUP. CT. R. 13.3.

*Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) (for purposes of § 2244(d)(1)(A), the one-year limitation period began to run when the time expired for filing a petition for *certiorari* with the United States Supreme Court); *Jackson v. Secretary for the Dep't of Corrections*, 292 F.3d 1347, 1349 (11th Cir. 2002). The statute of limitations expired one year later on August 22, 2001, unless there were pending during that time any properly filed applications for state postconviction or other collateral review.

The record reveals that petitioner had no properly filed applications for state postconviction or other collateral review pending during that critical period between August 22, 2000 and August 22, 2001; therefore, his time for seeking federal habeas review expired on the latter date. The instant habeas petition, filed on December 28, 2006, is untimely.

The only remaining issue for this court to decide is whether there is a basis for excusing petitioner's untimeliness. Petitioner asserts that this court's refusal to consider his petition will result in a fundamental miscarriage of justice because he can present a credible claim of actual innocence. Assuming, without deciding, that an "actual innocence" exception to the limitations period exists, the undersigned finds that petitioner has not stated a colorable claim of actual innocence. The Eleventh Circuit has previously assumed that if actual innocence provides a basis for an exception to the limitations period, the evidentiary showing delineated by the United State Supreme Court in *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995) would apply to determine whether the petitioner has made a credible showing of actual innocence. *See Arthur v. Allen,* 452 F.3d 1234 (11th Cir. 2006) (applying the *Schlup* standard to an untimely petition and holding that petitioner had not made a threshold showing of actual innocence), *modified on other grounds on reh'g,* 459 F.3d 1310 (11th Cir. 2006), *cert. denied,* --- U.S. ---, 127 S.Ct. 2033 (2007); *Sibley v. Culliver,* 377 F.3d 1196, 1205-06 (11th Cir. 2004) (same).

In *Schlup*, the Supreme Court set forth the standard of proof governing a habeas petitioner's procedural claim of actual innocence: The petitioner must show that constitutional error "probably resulted" in the conviction of one who is actually innocent. *Id.,* 513 U.S. at 324, 326-27, 115 S.Ct. at 865, 867. A mere allegation of

innocence is not enough; "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  *Schlup*, 513 U.S. at 324, 115 S.Ct. at 865.

The *Schlup* Court went on to make several observations about this standard.  With respect to the term "probably resulted," the Court clarified that, "[t]o establish the requisite probability, the petitioner must show that it is <u>more likely than not</u> that no reasonable juror would have convicted him in light of the new evidence."  *Id.*, 513 U.S. at 327, 330, 115 S.Ct. at 867, 868-69 (emphasis added).  With respect to the term "reasonable juror," the Court instructed: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented.  It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt."  *Id.,* 513 U.S. at 329, 115 S.Ct. at 868.

In assessing the adequacy of the petitioner's showing, the district court "is not bound by the rules of admissibility that would govern at trial."  *Id.*  Instead, the court is allowed also to consider "the probative force of relevant evidence . . . 'including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'"  *Schlup*, 513 U.S. at 328, 115 S.Ct. at 867 (quoting Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)).  The Court also observed that when considering an actual innocence claim in the context of a request for an evidentiary hearing,

> the District Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial.  Obviously, the court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment.  Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.

*Schlup*, 513 U.S. at 331-32, 115 S.Ct. at 869.

In the recent decision of *House v. Bell*, --- U.S. ---, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the Court did not alter the standard set forth in *Schlup*. It reiterated that standard, emphasized certain features of it, and evaluated the evidence developed in House's federal habeas proceeding under that standard. The Court did note, as a preliminary matter, that the parties in that case did not dispute that House had presented new <u>reliable</u> evidence. *House*, 126 S.Ct. 2064, 2077 ("There is no dispute in this case that House has presented some new reliable evidence; the State has conceded as much." (citations to record omitted)). In addition, because the district court in *House* held an evidentiary hearing, a decision the State did not challenge, the Court cautioned that it had no occasion to elaborate on *Schlup's* observation that the court may consider how certain factors bear on the probable reliability of the petitioner's evidence. *House*, 126 S.Ct. at 2077.

In the instant case, petitioner's showing of actual innocence consists of an affidavit from Roberta Williams, the victim in this case. The affidavit is signed and dated December 5, 2006, and states as follows:

> 1. I am over the age of twenty-one (21) years, and the contents of this affidavit are based on personal knowledge.
>
> 2. I was the victim in the above-styled cases and a mentally handicapped person who testified at Alvin Kirkland's jury trial on or about February 1, 1999, that he sexually battered me.
>
> 3. I was told to testify against Kirkland by Shirley Daniels, and therefore, I am repudiating my trial testimony.
>
> 4. I state under oath that I was not a victim in this case, that Kirkland never sexually battered me and that my trial testimony was untrue.
>
> 5. At a hearing held on Kirkland's motion for new trial based on my recanted statements implicating him, I was mentally incompetent to answer questions coherently and to testify that Kirkland had never sexually battered me.

**6. Again, I was told to testify against the Defendant Kirkland and now I voluntarily, at my own free will, attest that he has never sexually battered me.**

**I hereby swear that the above foregoing is true and correct.**

(Doc. 1, App., Williams Aff.).

**The affidavit presents no <u>new</u> evidence, and even if considered new, the affidavit does not possess the indicia of reliability demanded for a colorable showing of actual innocence under *Schlup*. As mentioned earlier, after the jury returned guilty verdicts on January 29, 1999, petitioner moved for a new trial based on Ms. Williams' alleged recantation of her trial testimony. On April 13, 1999 the trial judge held a hearing, at which Ms. Williams testified. Ms. Williams testified that Shirley Daniels told her what to say in court and that the things she testified to at trial did not happen. (Doc. 1, App., Sentencing Tr. at 23, 25). She also testified during cross-examination that what she said in court was the truth. (*Id.* at 27). The trial court ruled that Williams' testimony did not amount to a recantation, and if the testimony had been admitted at trial the outcome would have been no different because her proffered testimony was inconsistent.[3]**

**Apparently, because Ms. Williams' post-trial testimony (which petitioner characterized as a recantation) failed to convince the state trial court that a new trial was warranted, petitioner now attempts a second bite at the apple in this court, with Ms. Williams explaining that at the hearing on the motion for new trial she was "mentally incompetent to answer questions coherently and to testify that Kirkland had never sexually battered me." Notably absent from Ms. Williams' affidavit,**

---

[3]The court's ruling, verbatim, is as follows:

> I'm going to find that whether there was a recant or not, I think the case law is that it's not enough to grant a motion for new trial. In the alternative, I am going to find even if this testimony had been presented at trial I don't think it would have changed the verdict of the trial. At best it was inconsistent today and it really doesn't even amount to a recant.
>
> Based upon all of that I am going to deny your motion for new trial. . . .

(Doc. 1, App., Sentencing Tr. at 33-34).

however, is an explanation as to the cause of her temporary incoherence at the hearing, or an assertion that she has now overcome the alleged mental incompetence that affected her testimony.

Furthermore, the affidavit was signed on December 5, 2006, just twenty-two days before petitioner filed his federal habeas petition on December 28, 2006, and some <u>seven years</u> after petitioner's unsuccessful bid for a new trial and subsequent conviction, with no explanation for the delay.  An affidavit of this kind is "to be treated with a fair degree of skepticism" as it is "suspect, produced [several years after petitioner's conviction] with no reasonable explanation for the . . . delay." *Herrera v. Collins*, 506 U.S. 390, 423, 113 S.Ct. 853, 872 (1993) (O'Connor, S., concurring).  Moreover, without explanation, petitioner has apparently chosen not to present this "new" evidence to the state trial court.

Another factor which undermines the credibility of petitioner's current submission is that the Williams affidavit is in handwriting completely different from Ms. Williams' signature, but the same as petitioner's federal habeas petition, indicating that either petitioner or someone with an interest in his release composed it.  Based on the foregoing, the undersigned finds that the December 2006 Williams' affidavit does not present <u>new reliable</u> evidence of petitioner's actual innocence. *See, e.g., Arthur v. Allen*, 452 F.3d at 1244-46 (holding that exculpatory affidavits as to habeas petitioner's whereabouts on morning of murder, which were not presented at petitioner's first, second or third state court trials and which were finally produced at the eleventh hour with no reasonable explanation for this nearly decade-long delay, had to be regarded as suspect, especially where certain important details of affidavits were subsequently disavowed by affiants themselves, and did not raise sufficient doubt as to petitioner's guilt to undermine confidence in result of his trial, as required for him to avoid procedural bar posed by statute of limitations provision of the AEDPA).

Moreover, petitioner has failed to establish that it is more likely than not that any reasonable, properly instructed juror aware of the statements in Williams' 2006 affidavit, if Williams did make them, would have reasonable doubt about petitioner's

guilt. According to the parties' direct appeal briefs, (ex. D, pp. 3-7; ex. E, pp. 2-3), the evidence adduced at trial was as follows.

Roberta Williams ("Roberta") was a seventeen year old female with an IQ of 58. (Ex. E, p. 6 n. 2). She testified at trial that she went to Hope School. She lived with her mother, brother and sister. Ms. Sims was her teacher and was present in the courtroom. Roberta also testified that if you don't tell the truth, you get into trouble. On July 31, 1998 Roberta went to see her sister, Carolyn, in the afternoon. Carolyn lived down the road with Nelson Kirkland. Annabelle Kirkland lived in a house in front of theirs. Annabelle was old, bedridden and blind. Roberta went there to babysit her. Carolyn asked Roberta to babysit that day. Ikey (petitioner) greeted Roberta. Roberta sat on the sofa with Ikey. Shirley Daniels was in the bathroom. Ikey Kirkland lived in the house with Annabelle, as she is his mother. At the time, Annabelle was in the back room.

According to Roberta, Ikey reached over and felt on her breast. She told him to quit and he stopped. She went into the kitchen to boil some hot dogs. Ikey came into the kitchen and asked her if she wanted him to cook for her. She said no, that she knew how to cook for herself. Petitioner turned off the stove and pushed Roberta against a table with the microwave on it. He pulled her shorts down and stuck his hand with two fingers between her legs in her private area. She told him to stop. Petitioner then put his hand over her mouth. He took his penis out and he was trying to place it into her but he could not. His penis touched outside of her private part and she told him to quit. Petitioner told her not to tell anybody. Roberta did not want petitioner to do that to her. Shirley Daniels then walked up and petitioner pulled his shorts up. Shirley asked petitioner what did he think he was doing. Petitioner said that it was none of her business. Roberta told Shirley what happened and started crying. Shirley then called the sheriff's office. Roberta spoke with Mr. Davis from the sheriff's office. Later that night she met with a doctor. Roberta also testified that Shirley did not tell her what to say in court.

**Valdee Sheffield**, an emergency room physician at Jackson Hospital, testified that on July 31, 1998, she examined Roberta Williams. Roberta gave her the history and indicated that she was in the kitchen and was approached from behind. Her shorts were pulled down and a hand was put around her mouth. She was penetrated vaginally with a penis. This occurred around 5:00 p.m. Roberta was in the emergency room at approximately 9:20 p.m. Dr. Sheffield collected her clothing, blood, vaginal swabs, and smears. Her exam revealed vaginal tears and bruising. The vaginal tears were at the three, five, six, nine, and eleven o'clock positions. They were located at the vaginal opening, and were less that one centimeter. There was not active bleeding. In Dr. Sheffield's opinion, this was consistent with recent sexual activity, and the tears occurred within the past twelve hours. On cross-examination, Dr. Sheffield acknowledged that there was no sperm present, there was not bleeding, the hymen was not intact, and to her knowledge, there was nothing to link petitioner.

**Shirley Daniels** testified that she had one prior felony conviction and that last July she was living with Annabelle Kirkland and petitioner. She was petitioner's girlfriend. On July 31, 1998, at approximately 4:30 p.m., Roberta came over. She sat in the living room. Ms. Daniels went to the bedroom, then into the bathroom. After getting made up and ready to go out, Daniels went by the kitchen and saw that petitioner had pinned Roberta up against a table. Petitioner asked Daniels what she was looking at. Ms. Daniels did not reply. When petitioner separated himself from Roberta, Daniels noticed that he had an erection. Daniels asked Roberta what was going on and Roberta showed her a back and forth movement. According to Ms. Daniels, Roberta said petitioner stuck his thing in her and then he penetrated her. Ms. Daniels told Roberta to call the sheriff's office. On the way to Cottondale, Ms. Daniels was with petitioner to pick up her check. Petitioner denied being on the couch with Roberta. When they got back, Ms. Daniels told petitioner's mother. Ms. Daniels and Roberta went over to Roberta's sister's house, Carolyn, and they called the sheriff's office.

Lieutenant Walter Davis, of the Jackson County Sheriff's Office, testified that he interviewed petitioner. After being advised of his Miranda rights, petitioner gave the following statement:

> Okay, It was about I guess 4:30, maybe a quarter to five. Roberta Williams came over to stay with my mother 'cause I was getting ready to take my girlfriend to Marianna. And I was eating a hot dog at the time. She come in and sat on the sofa by me and we was talking because I told her finish [sic] get hungry she can go to the refrigerator and get what she wanted. There are some hot dogs in there open and I called her to the refrigerator and showed her where they was at and showed her how to cook 'cause she bought [sic] 'em from my sister's house and I showed it to her. And my girlfriend was in the bathroom while we was in the kitchen I was doing like a little stupid, they call it freak dancing. I my girlfriend came out the back into the back into the bath out of the bathroom she saw me in front of Roberta, that's Roberta Davis, and she said, did I see what I thought I saw at Roberta. And Roberta just said, yeah, yeah, like that. And she say she asked me was I in front of her. I say, yes. She say yeah, he was in front of me and that was basically it. And later on they went over to Roberta's sister's house which is a trailer right across from my mom house and they come back. She was telling me that they come, they come against her that I penetrated her and I was feeling on her which never happened but that's just my word against theirs. I, I didn't' do this 'cause I know what I'm being charged with already.

Petitioner denied pulling down Roberta's pants. After interviewing Roberta and Shirley, Lieutenant Davis interviewed petitioner a second time. In his second statement, petitioner stated that he did not touch Roberta's titty or vagina. He did however, touch her chest on the sofa. Petitioner had an erection while up against her.

On cross-examination, Lieutenant Davis testified that there was not blood on either petitioner or Roberta. Hairs from petitioner's head and pubic area as well as saliva were sent to FDLE. No sperm was found.

Now, in the affidavit petitioner has submitted, Ms. Williams states she is "repudiat[ing]" her trial testimony because Shirley Daniels told her to testify against petitioner. However, the fact that Ms. Daniels encouraged Ms. Williams to testify does not equate to Ms. Daniels' instructing Williams to lie about what petitioner did

or did not do on the date in question. Further, Ms. Williams' blanket statement that her trial testimony was "untrue" and that petitioner "never sexually battered me" is so general and conclusory, devoid of references to any particular statements at trial that were untrue, that this court cannot say that any reasonable juror would have reasonable doubt about petitioner's guilt even if Williams were to testify as set forth in her affidavit.

To put this case into perspective, the undersigned offers a comparison of the evidence petitioner has proffered with that adduced in *Schlup* and *House*. In *Schlup* a white prisoner, Schlup, was convicted of murdering a fellow inmate, Arthur Dade, who was black. The State's evidence consisted primarily of the testimony of two corrections officers who had witnessed the killing. As summarized by the United State Supreme Court:

> On the day of the murder, Sergeant Roger Flowers was on duty on Walk 1 and Walk 2, the two walks on the lower floor of the prison's high security area. Flowers testified that he first released the inmates on Walk 2 for their noon meal and relocked their cells. After unlocking the cells to release the inmates on Walk 1, Flowers noticed an inmate named Rodnie Stewart moving against the flow of traffic carrying a container of steaming liquid. Flowers watched as Stewart threw the liquid in Dade's face. According to Flowers, Schlup then jumped on Dade's back, and Robert O'Neal joined in the attack. Flowers shouted for help, entered the walk, and grabbed Stewart as the two other assailants fled.
>
> Officer John Maylee witnessed the attack from Walk 7, which is three levels and some 40-50 feet above Walks 1 and 2. Maylee first noticed Schlup, Stewart, and O'Neal as they were running from Walk 2 to Walk 1 against the flow of traffic. According to Maylee's testimony, Stewart threw a container of liquid at Dade's face, and then Schlup jumped on Dade's back. O'Neal then stabbed Dade several times in the chest, ran down the walk, and threw the weapon out a window. Maylee did not see what happened to Schlup or Stewart after the stabbing.
>
> The State produced no physical evidence connecting Schlup to the killing, and no witness other than Flowers and Maylee testified to Schlup's involvement in the murder.
>
> Schlup's defense was that the State had the wrong man.

*Case No: 5:07cv2/RS/MD*

*Schlup*, 513 U.S. at 302-03, 115 S.Ct. at 854-55 (footnotes omitted).

Schlup's proof of actual innocence came from (1) a videotape that showed him to be in the prison dining room when the murder took place some distance away, (2) the statement of a prison clerk who corroborated the time that the alarm sounded (in relation to the time Schlup entered the dining room) when there was no reason for the clerk to know that the timing made a critical difference, (3) an affidavit from a prison lieutenant who observed Schlup for over two minutes as he walked to the dining room, and who stated that Schlup was not hurrying, perspiring, or breathing hard, which would have been the case had he gone from the murder scene in time to arrive in the dining room when the videotape placed him there, and (4) affidavits from black inmates attesting to the innocence of a white defendant in a racially motivated killing. The *Schlup* Court concluded that the habeas court should consider this evidence to determine whether the new facts "raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without assurance that the trial was untainted by constitutional error." 115 S.Ct. at 317.

In *House*, Paul House was convicted of murdering Mrs. Muncey. The evidence supporting the conviction included: (1) testimony from Mrs. Muncey's children that late at night they overheard their mother talking to someone with a deep voice, like House (but also like their grandfather), telling her that Mr. Muncey had been involved in an accident; (2) Mr. Muncey came home soon thereafter, and asked where Mrs. Muncey was; (3) the next afternoon a Mr. Hensley saw House near an embankment in the Muncey's neighborhood, wiping his hands with a black rag, and House told Mr. Hensley that he had heard that Mrs. Muncey was missing and that he was looking for Mr. Muncey; (4) Mr. Hensley later came back and found Mrs. Muncey's body down the embankment near where he had seen House, and near where House's car had been parked; (5) the autopsy showed that Mrs. Muncey had been killed by being struck in the head; (6) House was interviewed by law enforcement and lied about his whereabouts on the night in question, and had scratches on his hands and arms; (7) law enforcement later seized the pants House was wearing on

the night of the murder, which were "heavily soiled" with "reddish brown stains;" (8) House's pants, blood samples from Mrs. Muncey's autopsy and other evidence were packed in a box and taken to the FBI lab in Washington, D.C.; (9) there was human blood on the pants which was not House's blood; and (10) there was semen in Mrs. Muncey's panties that could have been from House.

During House's federal habeas proceeding, he presented the following exculpatory evidence: (1) DNA testing establishing that the semen in Mrs. Muncey's panties came from her husband, not House; (2) testimonial and physical evidence of "evidentiary disarray" surrounding the State's blood evidence which would prevent reasonable jurors from placing significant reliance on the blood evidence;[4] and (3) testimonial evidence that Mr. Muncey admitted to several people that he had killed his wife, claiming that it was an accident.  The Court found that although it was a close question, House had satisfied the gateway standard set out in *Schlup*, and that the lower court could disregard the procedural default and review the case on its merits. --- U.S. at ---, 126 S.Ct. at 2087.

The evidence proffered by petitioner in the instant case comes nowhere near the evidence produced in *Schlup, supra*, and *House, supra*.  The court therefore concludes that petitioner has not made a threshold showing of actual innocence to avoid a statute of limitations bar to the consideration of his petition.

## CONCLUSION

The instant petition for writ of habeas corpus is untimely.  The record does not support the application of the equitable tolling doctrine or any other exception to the limitations period.  Based on the foregoing, the petition should be dismissed.

Accordingly, it is respectfully RECOMMENDED:

1. That respondent's motion to dismiss (doc. 13) be GRANTED.

---

[4]Specifically, House presented reliable evidence that the blood stains on House's pants had not been properly prepared or stored by law enforcement, and that the blood on House's pants most likely came from a spill when vials of Mrs. Muncey's blood were transported together with House's pants to the FBI lab, meaning that the blood did not come from Mrs. Muncey during the murder.

      2.   That the petition for writ of habeas corpus (doc. 1) challenging the convictions and sentences in *State of Florida v. Alvin I. Kirkland*, in the Circuit Court of Jackson County, Florida, case numbers 99-44 and 94-868, be DISMISSED WITH PREJUDICE.

      3.  That the clerk be directed to close the file.

      At Pensacola, Florida this 24th day of October, 2007.

                                  /s/ *Miles Davis*
                                **MILES DAVIS**
                                **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636;** *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).